Good morning ladies and gentlemen. And before we start with the case of schedule for this morning, this is a somewhat of an auspicious occasion on a couple of levels. To our left is Judge John Tinder, and this is his last regular sitting day hearing oral status and then retiring. But I just want to say a couple of things about John. You know, Indiana has produced some very outstanding judges, but I have to say that Judge Tinder ranks among the top, if not the top, of the judges that have come from our state, the state of all three of us actually. He was appointed in 1987 by Ronald Reagan to the district court, served there with great distinction, and which led some years later, I guess 2007, John, President George W. Bush appointed him to our court here in Chicago, the Court of Appeals. And of course before that, he served as a U.S. Attorney for the Southern District of Indiana from 84 to 87. He's just had a distinguished legal and, more importantly, judicial career and truly is one of the outstanding judges in the United States. So we're sorry to see him go, and he's leaving earlier than, well, than I have. Not so much Judge Ripple is sort of taking a halfway. He's taking seat for status at that age, but we are really and truly going to miss you, John. Thank you, Mike. Actually, I had so much trouble as a single judge on the district court. They moved me here to keep the distinguished other judges looking over my shoulders, straight and true. But thank you. It's been the greatest pleasure and privilege that anyone could have to serve with my colleagues here. Thank you. Well, we thank you. And the second order of business this morning is the swearing in of the law clerks of Judge Ripple. So, Judge Ripple, do you want to? Thank you, Judge Ripple. Judge Kaney and Judge Tinder, I have the honor of moving the admission this morning of my two term clerks, Mr. Derek Woodman and Mr. Justin Lallman. Mr. Woodman is a graduate of the University of Michigan where he studied political science and history and of the George Washington University Law School where he was a member of the Law Review. After he has served the court with distinction and will be leaving us at the end of the term to practice law in Washington, D.C. Mr. Justin Lallman did his undergraduate work also in political science at Oklahoma State University. He then went on to the University of Virginia where he was a member of the Law Review. After he finishes again a distinguished service to the country in the court with us, he will be staying with the judiciary and clerking for the Honorable Gregory Frizzell of the Northern District of Oklahoma. And after he finishes that clerkship, he will enter the private practice of law in Tulsa. I am deeply honored to move their admission to the bar of this court. I join the motion. And ask you why? Well, you are admitted to the bar of this court. I ask the clerk to administer the oath. I do. Thank you. All right, we're ready to proceed then with the first case this morning, Hillman v. Abbott Laboratories. Mr. Sabella. Jim Sabella for appellants. A motion to dismiss based on the statute of limitations cannot be granted unless the complaint pleads facts that show definitively that the claim is time hard. The court below based dismissal not on what's in the complaint but on the court's assumptions as to when a reasonable employee benefit plan would have discovered that it had been injured by the defendants. This is a complicated factual question that turns on several disputed areas of facts, such as when would a reasonable plan discover that it was paying for off-label indications? And even if it did, when would the plan discover that the off-label prescriptions were due to conduct off-label marketing by the drug company? These are factual issues. There's nothing in the complaint that illuminates the answer to those questions. And I would submit that the court erred in granting a motion to dismiss based on so many factual issues. First of all, sir, did you raise this issue of when the injury occurred in the district court? In response to the defendant's brief, we raised the question that there were factual issues that precluded adjudication of a statute of limitations. That was done as a fairly prefatory remark to your arguments on the equitable doctrines of estoppel and tolling. Without question, the brief spent more time on the tolling doctrines than it did on the overall point that there are just factual issues that preclude determination of this issue. But I think saying that, and if you look at the brief, which I know your honor has, we said that there were factual issues and also there are tolling doctrines. And do we have any idea when the third party payers, the TPPs, actually become aware that the charge that was submitted was for an off-label use? Does the record reflect that? Not at all. And the record doesn't and the complaint doesn't. In response to our brief in this court, as you other things, factual materials that suggest they could discover it here, they might do this, they might do that. But there's absolutely nothing in the complaint, which is what you have to look at, or things that the court below took notice of, which is what you have to look at, that indicates how they test, if they test, what they do, what a reasonable plan does to see if they're paying for off-label, and then what a reasonable plan does to investigate if there's off-label marketing. There's just nothing in the complaint on that. Well the complaint does allege that your plans began paying, I think, around 98 for thousands and thousands of these off-label uses of Depakote, right? Yes, but not that they knew that these were, they were just paying thousands and thousands of prescriptions and Depakote had been approved by the FDA for a lot of indications. But a plan doesn't just pay any prescription, it has to be useful for the condition suffered by the patient, doesn't it? Well, that's a factual issue, actually. There was a case that we cite, the iron workers case, which basically said that under the terms of a lot of these plans, they have to pay. And the fact is, even if it's an off-label indication, if the doctor prescribes it, the plan generally pays for it, and it's only wrongful if it was due to off-label marketing. In other words, a doctor can take, you know, Celebrex or something and say, you know, I think this is going to be useful for A, B, and C, why don't you take it? Plans generally pay, or let me put it this way, there's nothing in the complaint on which a court could base a decision that the plan shouldn't pay that or should investigate about that. But as a practical matter, you've got thousands and thousands and thousands of these that are off-label for more than a decade. As it turned out, yes. So after some point in time, there are just so many dots there that there had to be some connection, didn't there? That you've got this being prescribed for conditions that are not included within the labeled reasons? Well, we don't even know from the complaint whether the plans know what the indications are they're being prescribed for. I mean, when I go to my doctor and he prescribes, you know, whatever, Celebrex, just to use an example that's not involved in this case. I don't know that my plan gets it. I mean, it's a factual question. I don't know that the plan is told what it's being prescribed for. And as I said, Defco was approved for a lot of indications. But even if they knew it was off-label, would a reasonable plan then go about investigating whether there was off-label marketing going on? I mean, if that's... Well, the plans cover certain off-label uses, correct? I think they cover most of them. Certain are legitimate, and there are only certain ones that are illegitimate in the eyes of the FDA and would not be approved. There are certain where it's clearly ineffective and maybe even dangerous. And there are other off-label uses where, you know, I suppose the jury is still out. But the point I wanted to make is that every drug company pays thousands and thousands... Every employee benefit plan insurance company pays thousands of prescriptions every week, every month. I mean, that's what they do. And probably every one of those prescriptions, there's off-label indications going on. Doctors sometimes write stuff for off-label indications. And they could do it on their own. In November of 2009, the Abbott issues an SEC filing disclosing that DOJ was investigating their marketing program. Yes, sir. So by then, they should have known. I mean, it's pretty hard to see how they shouldn't have known about that SEC filing. Right. At that point, they know there's an investigation into off-label marketing. Now, I would say two things about that. Number one, we filed within four years of that. So if that's really what starts the clock running, we filed within four years. But secondly, the brief has cited the Narantan case. And Narantan was very, very similar, where there was a disclosure about investigation into off-label marketing. And the court said, well, even that really didn't put them on notice that what was being involved in this case. So in Narantan, at least, they said even that wasn't enough. But if it is enough, we filed within four years of that. So the one point, just to follow up on the point I was making, if a drug company has to begin investigating, are they paying for off-label indications? And more importantly, is the drug company conducting off-label marketing? Every time it pays a prescription for practically anything, I think the consequences for the medical insurance industry and the cost of medical care skyrocket. I mean, right now, today, every insurance company is paying for thousands of claims. So they have to immediately say, well, I think maybe Pfizer's engaged. I think maybe Abbott's engaged. I think maybe Shearing Plow's engaged in off-label marketing, and start investigating them all. I can't believe that that is the law. And I don't think any court has ever said that is the law. In this connection, if I could, Your Honors, in preparing for the argument, I came across a pretty good case cited right about the time we put our reply brief in. If you don't mind, I'd like to just mention, maybe your clerks have already found it. I don't know. But it was a case called Selexa Marketing. It's in the District of Massachusetts. Did you give your opponent the opportunity to see the name of that case? I found it two days ago. I haven't called him. I'll let you go ahead. I'm sorry. 2014 Westlaw 7009339. It was an off-label marketing case. And basically, the court said the question of when should they have known that they were paying for ineffective off-label uses was a question to go to the jury. I think it's instructive. I would note that I don't think the defendants have cited any cases that indicate that merely paying for a prescription is the kind of thing that, as a matter of law, which is what the court below held, as a matter of law, puts a employee benefit plan on notice, not only that it's paying for off-label indications, but that it should be start investigating whether or not a drug company is engaged in off-label promotion. There's a dispute in the papers about whether or not the rule is that accrual occurs when the plaintiff discovered just that he's been injured or discovered also who caused the injury. Now, first we argue that the whole question of injury has to be tied up with the who caused the injury, the off-label promotion, because just paying for a prescription is really not injury unless there's some off-label marketing. But the two cases that we rely on, that you have to have some inkling that the defendant is involved here, are Barry Aviation and Cancer Foundation. And I think Judge Ripple was on both of those panels, and if memory serves, I could be wrong. I think you wrote Barry Aviation. You didn't like that case very much according to your brief. No, no. I like the rule in Barry Aviation. And, you know, Mr. Kavanaugh thinks that it should be overruled. I'm sorry. He's the guy I thought I was at to lunch. I think Your Honor got it right, that accrual occurs when you know you've been injured. The simple fact of the matter is we have waffled on that. There's a case by another member of this court just a couple of years ago, which repeats that exact formulation. So we certainly have not spoken with one voice on the issue of identity. Right. And ultimately the Supreme Court may weigh in on that, but it hasn't done so thus far. Mr. Kavanaugh says in his brief that he thinks the accrual is inconsistent with Barry Aviation. I don't think that's the case. I mean, all Rotella said was that accrual doesn't await discovery of all the elements of the pattern of racketeering. It adopted, it suggested that a discovery rule is going to be the right, an injury discovery rule is going to be the right rule, and it analogized the situation to medical malpractice. And here's the quote, approvingly saying this supports what we're saying. And in Rotella, the Supreme Court said the plaintiff can sue when, quote, in possession of the critical facts that he has been hurt and who has inflicted the injury, close quote. That's on page 556. So, you know, to the extent that the Supreme Court was thinking about this issue at all, and I'm not sure they really were, but the language of that opinion supports Barry Aviation and the notion that you have to have some inkling, some inkling that the defendants involved and simply paying a prescription, even if you knew it was for an off-label use, is not enough. I would discuss the waiver point very, very briefly since Your Honor brought that up. As I said, I believe our brief below said enough to preserve the point. It was not as elaborate as our brief in this court on those issues, but it clearly spoke separately that there's an issue of fact point and then there's the tolling agreement, tolling doctrines point. Could you speak to them a little bit and the ways by which you at least allege that Abbott tried to hide the ball? Right. Abbott's, I mean, basically the scheme was that they set up these enterprises to promote off-label uses of debit code. And they hid the fact that they were essentially writing the scripts. And they hid the fact that they were paying these doctors and telling these doctors what to say and what to promote. And they hid the fact that they were basically doing the training to, their whole connection was hidden in terms of these enterprises. And that's the way that they conducted the off-label, that's the way they conducted the off-label marketing. And what we contend is that since, that the court below really committed an error of law, the error of law being not applying Barry Aviation, not focusing on the fact that it's the defendant that caused the injury by setting up these phony enterprises and promoting the drug surreptitiously. And if it's an error of law, even if we did not fully articulate in our briefs below all the arguments that I'm making now on the factual issues, this court is empowered to reverse the district court's error of law. And we relied for that on Hedge against County of Tippecanoe and Rosser against Chrysler, two more cases where Judge Ripple was on the panel. So I think, I like the fact that we've relied on those cases. And it's interesting too, the district court below did not suggest, did not suggest that we had waived any point about when the injury was known or when the claim accrued. She basically decided it on the merits of that issue as she saw it. I think she got it wrong. I mean, she articulated the Cancer Foundation, Barry Aviation position that you have to know when the injury occurred and who caused the injury. But then she essentially proceeded to ignore it and just make factual findings that are not based on what's in the complaint. Just to make sure I understand, you do argue, sir, that you win, even if it's the recognition of the discovery of the issue of the injury. Yes, because I don't think that just paying a prescription is discovery of the injury. That's exactly right. So the dicta in Barry really isn't essential to your case.  With respect to the tolling doctrines, let me just spend a minute on that and then I would sit down. The dispute in the paper seems to be whether or not we need to allege what diligence, if any, was undertaken. It seems to me that the proper rule, the question is, it's an objective test, whether or not any diligence would have discovered what was going on. So the plaintiff can't say, well, I didn't investigate and I didn't find anything and therefore I get tolling. He can't say that. But if the facts are that even with diligent investigation he could not have uncovered what was going on, then it seems to me that the tolling doctrine, equitable tolling, applies. And again, that's a heavily factual issue. We do not allege, I would say candidly, in the complaint particular diligent steps that were taken. But we do allege that we could not have discovered Abbott's wrongdoing in the exercise of reasonable diligence. And that's at page 54 of the appendix. And I think that's sufficient to invoke the tolling doctrine and it's not necessary under this court's decisions in Taylor against Merrick and Norris against Wirtz to allege more in the complaint. And lastly, Your Honor, I would just reiterate the importance of the Copper Antitrust case. Copper Antitrust quoted and relied on Barry Aviation. The court reversed a dismissal as to one defendant because in that case it was clear that the plaintiff knew that Sumitomo was engaged in the violation but they did not know about the involvement of J.P. Morgan. And the inquiry notice about Morgan's role in late 1999, that was when the four-year period began to run, not at some earlier date. I suggest, Your Honor, that's the situation we have here. And even if the 2009 disclosure of the SEC's investigation somehow put them on notice, we filed within four years. Do you think it would be fair to characterize your client as sophisticated in this particular? I think that's fair. I don't think it is dispositive or proves a whole lot. But yes, they are sophisticated. But the question is what does a reasonable plan do under the circumstances? I think we have to have an expert to decide that, or at least some testimony and some evidence. Well, I suppose at some point, but there certainly could be blatant examples where expertise is not required. There may be hypothetically, Your Honor. I don't think this is it. With that, I'll sit down and reserve for rebuttal. Thank you, Your Honor. Mr. Cavanaugh? Thank you, Your Honor. May it please the Court, William Cavanaugh on behalf of the defendant and appellees here. The District Court correctly held that a reasonably diligent funder third-party plaintiff would have discovered an alleged injury by virtue of off-label promotion of Depakote well before August of 2009. There's 11 years. Plaintiff filed a complaint that said our injury goes back to 1998. As you just heard, they're a sophisticated entity. They are in the insurance business of evaluating claims, prescription claims, medical claims across the board. That's their business. As ERISA plans... But off-label usage of drugs is not unusual. It's not unique. It's almost common. That is certainly true. But to some extent, when the pattern of off-label use, as some of the articles we cited note, when it's 80 percent for anticonvulsants, it starts... And when the utilization is increasing, at some point there is inquiry notice to look into what is going on with those off-label prescriptions. The theory... If I understand the plaintiff's theory here, it's not the off-label usage by the prescribing physicians that is the heart of their complaint. It's the marketing to those physicians by Abbott. In order for them to have a cause of action is certainly true. But I would ask the court, look at the claim, look at the class that they are seeking. The class they sought in their complaint was simply class of all third-party plaintiffs who reimbursed for off-label use of Depakote. Now, it is true to have a cause... So that's their class. That's what they were focusing on, any off-label use. Now, it is correct in order to have a cause of action against Abbott, they would have to show that we somehow caused those. But in terms of their harm that they were complaining of is we paid, in their view, for thousands upon thousands of off-label prescriptions of Depakote. Well, 11 years went by. Anticonvulsants were a subject of numerous articles, numerous lawsuits. This is a sophisticated plaintiff that was a plaintiff in 2006 in off-label cases. And as the district court I think correctly held, we're speaking about an 11-year period with a sophisticated entity who's in the business of evaluating insurance claims. This court can certainly take judicial notice of how insurance companies as a general matter work. The problem I have, Mr. Cavanaugh, is that may well be true, but I don't know it's true because I don't have any facts to show me how that industry works and when the TPP would, in the normal course of its business, have a heads-up on this. I don't usually in these cases see this at summary judgment. I think this judge decided to get rid of this on the complaint. I mean, it's an unorthodox way to handle this. I take your point, Your Honor, but let me say what I think this what distinguishes this from the hypothetical Your Honor just gave is the period of time that we're talking about here. The 11 years and the fact that you have a sophisticated entity that has a fiduciary duty. They don't challenge the case law. I'm curious about that. Your brief talks a lot about this. Why do you get the benefit of that fiduciary duty? That fiduciary duty runs to the plan members, not to the vendors. But Your Honor, it creates a legal obligation on their part. To the beneficiaries. Yes. But I don't see how that helps you at all. Your Honor, we have the right to rely upon who is the plaintiff in front of us. And courts have looked at, is this a sophisticated plaintiff? And this sophisticated plaintiff also has legal duties. And I think in looking at their degree of sophistication, you can look at what are their legal obligations. It's hard for me to see how any of those duties run to your client. I don't think it matters whether they run. Let's assume, Your Honor, you're a publicly held company. You have SEC reporting obligations. You have various Sarbanes-Oxley obligations. I think a defendant would have the right to rely on those. Those duties might not run to that defendant. But the defendant would certainly have the right to say, you're a large publicly held company with SEC, Sarbanes-Oxley. And to the extent those factors might be relevant, to take that into consideration in looking at whether an objectively reasonable third party plaintiff at some point had a duty to look at the off-label use of DEPA code. And the district court correctly held that, given the fact that they alleged an injury going back to 1998, and the fact that they are a sophisticated entity, that obligation was created long before 2009. Let me speak to the waiver point. Before you get to that, Your Honor, there was a qui tam. That first one was filed in October 2007. How does that play into your theories in this? Well, certainly the qui tam was not unsealed at that point. It was not unsealed until a later date. But it certainly showed that others were able to determine that there was allegedly improper off-label utilization. So there were individuals capable of discovering those facts. The facts were out there. And the articles and various lawsuits we cite in our brief, of which we take judicial notice, show there were widespread reports of off-label utilization of DEPA code and of anti-convulsants, up to 80% of off-label utilization. Their harm they complain of is off-label utilization of DEPA code. Certainly that put them on notice that they were being injured. Mr. Cavanaugh, do we know who the plaintiffs were in those qui tam actions? I do, Your Honor. And I'm blanking on who they were. I don't believe it. The court can look at the complaints and take judicial notice of who the plaintiffs are. If I could speak to the waiver point. We made a very specific argument to the district court. We said the complaint alleges injury as of 1998. We have a sophisticated entity. The injury starts back then. That's when you look at its discovery of injury under this court's precedent. They never engaged on that issue. They have a perfunctory opening paragraph to a tolling discussion, which talks about statute of limitations is typically a fact issue. On appeal, for the first time, they argue, well, it's more than a discovery rule. Because the district court appeared to understand that the issue of injury was before her. I mean, she addressed it. That's because we presented the issue of injury. They did not challenge the legal standard, nor did they challenge the specific argument we made as to 1998. Under this court's precedent, I believe they have waived that argument. They made a strategic decision to focus their argument here on tolling, on equitable tolling and equitable estoppel. If you read their brief, I don't believe any other reasonable conclusion can be drawn as to the argument that the district court understood they were making. And that rises to the level of waiver. So if we don't buy your waiver argument, do we have to overrule Barry Aviation to reach your result? No. For two reasons. I agree with you, Your Honor. There is some uncertainty as you look at this court's precedent. If you go back to the McCool decision and the Cotta decision, this court said it is simply a discovery of injury rule. There was no additional reference to needing to identify who the perpetrator was. And I would suggest the Supreme Court's rulings in Clare and Rotella make it clear they are either going to adopt a discovery of injury rule or actually go further and say it is simply an occurrence rule and discovery doesn't matter because the RICO statute is based on the Sherman Act. Well, as you point out in your brief too, Mr. Cavanaugh, in Barry the allusion to the perpetrator of the injury was dicta. It was dicta. But it is also true that in Copper and I Trust there is a reference to discovery of injury and the perpetrator. But I don't think it matters, Judge Stinson, to answer your question because here the case they cite where it wasn't clear whether JP Morgan was involved or was it Sumitomo, you have multiple defendants analogizing to a groundwater contamination case. Who put it in the groundwater? When did they do it? Here there is only one manufacturer and promoter of Depakote. It is Abbott. So even if we take the Barry aviation standard and we have to have some reasonable idea of who the perpetrator might be, it could only be one person. But if these were individual decisions by a variety of physicians to prescribe off label, there is no case. Their case is if there is this improper marketing for off label. That is true. So discovering the identity here is very well intertwined into the question of whether there is an injury. I would say, Your Honor, that's why discovery of injury makes sense because it creates a reasonable diligence, an obligation to go figure out, okay, we're getting all these off label prescriptions which they say is harm to them. Now, is it a function of some wrongdoing? And so you look at what's the source of these off label prescriptions? Is it the judgment of an individual physician or is it being influenced by the manufacturer? There is not a high degree of, well, we don't know who is putting the contaminant into the groundwater or we don't know, was it Sumitomo? Is there a claim against JP Morgan? Here, there is one promoter of Depakote. It is Abbott. And therefore, we believe the appropriate legal standard is discovery of injury. But even if the court were to adopt Barry Aviation, which I do believe the language in there is dicta as to the by the defendant, I don't think the rule changes. I do think a better policy approach is that if there's any uncertainty as to the discovery or an inability to identify who's causing the harm, that is better treated as a tolling issue. Now, the problem the plaintiff has with tolling, which is how they base their argument in the lower court, is that there are no allegations of any investigation. None. They exercised no diligence. In order to rely on tolling... I guess the trouble I have with that is this is the complaint and they don't have a duty to plead around a statute of limitations defense, whether it be through tolling or a stop or what have you. This is the complaint. If we were here on summary judgment, your argument makes a lot more sense to me. The response to that, Your Honor, is it is possible to plead yourself out of a case. And by alleging that their injury goes back to 1998, they now have, we raise statute of limitations. They have to plead something that shows if it's a discovery rule, their injury goes back to 1998, they have to somehow, if they're going to now rely on an equitable doctrine on which they have the burden, they have to plead, we engaged in reasonable diligence. You don't get there. The second problem they have, Your Honor, is in a tolling case, in order to avail yourself of tolling, you have to show you brought the suit as soon as possible. Courts have held a matter of a few months isn't sufficient. Here... I'm just not sure why they would have to show that in their By virtue of alleging an injury going back to 1998, a RICO claim based on they're seeking damages going back to 1998, there is a discovery rule, it is then incumbent upon them to explain why they didn't bring this lawsuit within four years of 1998. They didn't do that. They did not plead any facts, nor did they go back to the district court and say, let us amend our complaint. We have facts we can plead that show that we engaged in a reasonable investigation and that we are entitled to a tolling here. They didn't do that. They did not bring their case as soon as possible, which is what tolling requires. They brought their case almost four years after notice that Abbott was under criminal investigation and 15 months after a guilty plea. That is not acting as soon as possible. And if the court reads the cases on tolling, it is as soon as possible is a relatively short period of time. Courts have thrown cases out where you waited three or four months. Here, we're talking years. They have the same problem with equitable estoppel. No investigation, no allegations of any sort of causal relationship. The one thing they identify, the website, it was in the Keetam complaint, and they don't show any causal relationship to how that could have conceivably delayed their filing suit. I do think their complaint, Your Honor, to answer your question very directly, I do think their complaint by alleging an injury going back to 1998 created an obligation on their part to plead facts that would entitle them to rely upon a tolling or an equitable estoppel doctrine. And the complaint failed to do that, nor did they offer to the district court that they had facts that would show that they had done any investigation. Unless the court has any other questions. Thank you. How much time? You have three minutes left. I don't think I'll take that. I really just wanted to make a couple of points. Mr. Kavanaugh talked about the Keetam being unsealed in 2011, and he said that showed the facts were out there. Well, I mean, the way a Keetam works is, and the whistleblowers in that case, I believe were individuals. I believe they were former employees. Individuals often come to lawyers who represent whistleblowers and give them facts to bring a case and hopefully recover a bounty. The fact that there might have been ex-employees or current employees there who had knowledge of what Abbott was doing hardly is the kind of thing that an insurance company is going to become aware of or track down. It's not that the facts were out there. There were a couple of whistleblowers who went to some lawyers to bring a case that was kept under seal until 2011. And then there's this, we talked a lot, or Mr. Kavanaugh talked a lot about the fiduciary duties and things like that. I think the important thing to remember is that these plans are obligated to pay, even if they're off-label prescriptions. The Iron Workers case that we cite in our brief, it's an 11th Circuit case, but it's got great language, and I think it really sums up the point. And it says, although placed on formularies based only upon FDA-approved uses, the drug's placement on those formularies contractually obligated the insurers to pay the drug's price any time it was prescribed. Therefore, the insurers had to pay, regardless of the facts surrounding the prescription. They had to pay if the drug was prescribed for an FDA-approved use or an off-label use, even if the prescription was medically unnecessary or inappropriate. Now, I'm not that is necessarily what we're going to find when we get into discovery, but there's nothing in the complaint that says that's not the case. And if that is the case, I think it underscores the reason why every time a prescription comes in, the insurance company does not have to run out, and usually does not run out, and try to track down, is it off-label, and is the off-label promotion going on? Do they have tools where they might do that? Mr. Kavanaugh cites a bunch of articles that says, oh, insurance companies could do this, could do that, and maybe they could, but none of that's in the complaint, and none of that's the stuff of a motion to dismiss. That's all I have. Thank you. Thank you. Thanks to both counsel. The case will be taken under advice.